Cite as 2023 Ark. 183

# SUPREME COURT OF ARKANSAS
No. CR-23-102

| | |
|---|---|
| | **Opinion Delivered:** December 7, 2023 |
| JEFFERY ALLEN WORKMAN | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT [NO. 66GCR-21-26] |
| APPELLANT | |
| V. | HONORABLE STEPHEN TABOR, JUDGE |
| STATE OF ARKANSAS | |
| | AFFIRMED. |
| APPELLEE | |

**BARBARA W. WEBB, Justice**

A Sebastian County jury convicted Jeffery Allen Workman of first-degree murder, aggravated residential burglary, and second-degree battery. As a habitual offender, Workman received consecutive sentences of life in prison, life in prison, and 180 months, respectively. On appeal, Workman argues that the State failed to provide substantial evidence that he committed first-degree murder. We hold that Workman failed to properly preserve this issue, and we affirm his convictions.

## I. *Facts*

The charges stemmed from a February 14, 2021 incident in which Workman broke into David Crone's residence, purportedly to retrieve from David Basham, who lived with Crone, a computer belonging to Jennifer Martin. In the course of this intrusion, Workman shot and killed Basham.

At trial, the State presented testimony from all of the people who survived

Workman's intrusion. Eleven-year-old Alexis Crone testified that on the date in question, she, along with her father, David Crone, were sleeping on couches in the living room of the townhouse that they shared with her brothers, Logan and James, and Basham. Alexis stated that a "medium-tall" man wearing a gray hoodie and boots and holding a bat, kicked in the door and shouted "get down on the ground." She saw the man run upstairs, followed by Crone. Subsequently, she heard gunshots and people screaming. Alexis saw the intruder run down the stairs and leave the apartment. She denied hearing anything said about a computer. Alexis also noted that Crone had suffered a bloody head wound.

Alexis's thirteen-year-old brother Logan testified next. He recalled that in the predawn hours of February 14, he was playing a video game in the room he shared with James, who was asleep. Basham was sleeping in another bedroom with his girlfriend, Debbie Torres. Logan testified that he heard someone run up the stairs, so he peeked through a hole in the door and saw the face of a man whom he did not recognize. The individual was wearing a gray hoodie, but his face was clearly visible. Subsequently, he heard Basham yell, "Get out." Six loud "bangs" followed. James woke, and Logan stated that he told him to call the police. He then heard Debbie screaming. He remained in his room until he saw from his window the intruder running behind the townhouses. Subsequently, he saw Crone go into the bathroom. Blood was running down his face from a deep gash in his head.

The third Crone child, seventeen-year-old James, confirmed the sleeping arrangements in the apartment, adding that Basham's dog, a pit bull named Milo, was also staying in the room that was occupied by Basham and Torres. James stated that he was awakened by two loud gunshots. He saw a person dressed in a gray hoodie in the hallway

2

outside Basham's bedroom. According to James, he saw the assailant run down the stairs with Basham in pursuit. James subsequently unlocked his door and went downstairs in search of his father. He saw Basham lying on the floor. Eventually he found his father in the bathroom. A couple of days after the incident, James took a picture of his father's injuries, and the picture was introduced into evidence and published to the jury. It showed a wound that ran diagonally from the middle of Crone's nose to his hair line.

The State addressed the issue of the ownership of the computer that Workman was purportedly seeking when he entered the Crone residence. After Jeff Wilkinson, the assistant security officer and executive vice-president of Farmers Bank sponsored into evidence the Hackett branch's surveillance video from February 3, 2021, David Crone was called to testify. He stated that he had purchased a computer from Jennifer Martin with cash he got from Farmers Bank ATM. The surveillance video from Farmers Bank was played, and Crone confirmed that it showed him at the ATM as a passenger in Jennifer Martin's car, along with Basham.

Crone then described the events of February 14. According to Crone, he is hard of hearing and did not hear the door being kicked open. He awoke when he heard what he believed was a gunshot. He climbed the stairs and encountered a man whom he did not know. He described him as wearing a light-colored hoodie and sporting a goatee. According to Crone, he saw a gun in the man's hand, and the man pointed the gun at him. Crone further testified that when he reached the top of the stairs, the man struck him in the head with a bat. At first he thought he had been shot, but that fear was allayed when he looked in the bathroom mirror. After making sure his boys were safe, he went downstairs and saw

Basham lying on the living room floor. He briefly spoke to the 911 operator and attempted to help Basham but acknowledged that he "couldn't do nothing." Soon, EMS personnel arrived and quickly began to attend to Crone. Crone went to Mercy Hospital where his head wound was treated. While there, he learned that Basham had passed away.

Crone testified about the lingering effects of being hit by the bat. He stated that it makes it hard for him to walk, makes his deafness complete in his left ear, causes him to suffer from headaches, requires an increase in his antiseizure medication, and left a permanent scar. He also claimed to have some memory loss.

Debbie Torres testified next. She stated that on the day in question, she was spending the night with her boyfriend, David Basham. Her pit bull, Milo, was in the room with her. Basham had a room in Crone's apartment where he stayed for more than a year. In the early morning hours of February 14, she heard someone yelling for Basham. Basham got up and left the room, closing the door behind him. Torres stated she stayed in bed. She then heard someone asking Basham for a computer. She heard Basham reply, "Man I got you. I got you." His response was followed by two gunshots. Torres testified that she got out of bed and opened the bedroom door. Milo tried to attack the intruder, who was standing approximately two feet away from Basham. According to Torres, she witnessed the intruder shoot Basham. She then saw the intruder strike Crone in the head with a baseball bat, which caused extensive bleeding. The intruder also hit Milo with the bat, causing the dog to run downstairs. Basham followed. At some point, the intruder left. Basham told Torres to call 911, and she did as requested. Torres stated that she went downstairs and saw Basham on the couch "flopping like a fish out of water." Basham had a burn mark on his chest. Basham

4

slipped to the floor, and she held him and urged him to hang on as the ambulance was on the way.

On cross-examination, Torres stated that Basham told her that Jennifer Martin had rented the computer and that he had sold it to Crone. She stated that Basham told her to give him a few weeks. However, she speculated that Martin must have made Basham angry because he told Martin that he was not going to get her computer back.

Sebastian County first responders testified next. Deputy Lloyd Bates of the Sebastian County Sheriff's Department said he was the first to answer the 911 call. After canvassing the scene, he entered the apartment. He noted that there was "blood everywhere." Basham was lying on the floor, and Torres was screaming, "Help him!" Deputy Bates checked Basham, and upon finding no pulse or chest rise and seeing the amount of blood loss, determined that he had died. He went upstairs. He noted blood on the walls and a number of spent shell casings. He secured the crime scene. He turned his attention to the other persons inside the apartment, including Crone, who he observed had a "huge gash on the right side of his head." Sebastian County paramedic Casey O'Mara testified that he confirmed that Basham had expired and likewise confirmed the extent of Crone's head wound.

Robert Crouch, lead investigator from the Sebastian County Sheriff's Office, processed the crime scene. Without objection, he introduced photographs of the residence, including a photograph of the broken door jamb, and the five spent shell casings that he recovered. Mitchell Sharbor testified that he assisted Crouch in gathering evidence. Sharbor testified that he received a laptop computer from Crone. It was entered into evidence and

transported to the Arkansas State Crime Laboratory. There, Adam Wilson, a certified computer forensic expert examined the hard drive but found nothing on the computer "of evidentiary value."

Investigator Cody McConnell testified that when she interviewed Jennifer Martin, Martin revealed that she and Workman had dropped off some property at what was later determined to be the residence of Steven Nelson. Nelson testified that he was an acquaintance of Workman's. At Workman's behest, he held for him a pair of red tennis shoes and a box that contained some sort of electronic device. Investigator Crouch subsequently testified that when he executed a search warrant at Nelson's residence, he recovered the shoes and the box. In the box, under an electronic door lock, was a green Crown Royal bag that contained the 9mm Ruger that was later determined to be the murder weapon. Also found on the property was the baseball bat that, through DNA analysis, was revealed to be the weapon that was used on Crone.

Investigator Darrell Miner of the Sebastian County Sheriff's Department testified that he, along with Captain Anthony Sacco, interviewed Workman after Workman was arrested along with Jennifer Martin on February 14. In that interview, Workman admitted having a prior altercation with Basham but denied having anything to do with his murder. The State indicated it intended to conclude its case-in-chief by playing a video of a second interview in which Workman confessed to the home-invasion burglary and murder.

Just before the State addressed the second statement, Workman elected to represent himself. The circuit court strongly advised Workman against that decision. Nonetheless, the circuit court granted Workman's motion to represent himself.

As the trial resumed, the State presented the testimony of Investigator Josh Helmert, who, along with Captain Sacco, interviewed Workman on February 18. Workman began the interview by asserting that "[he] didn't go over there with the intent to hurt that guy." He then described the events of February 13–14. He stated that he accepted an invitation from Martin to go to her apartment. Once there, she begged him to retrieve a computer from Basham. Martin claimed that the computer contained evidence that Basham had messaged her daughter. From the outset, he did not want to get involved at all and claimed that he repeatedly refused to help her. However, as he and Martin spent the evening getting high on methamphetamine, his attitude changed. According to Workman, Martin "played on his emotions," and he began to think about what he would do if it were his "little girl." Eventually, Martin got him "hyped up," and he agreed to get the computer. Because he was concerned with confronting a "pretty big boy," he decided to bring a gun to "control him." According to Workman, he only had three bullets, and Martin brought him three more. Together, they drove to Basham's residence in Martin's car. He got out and Martin moved to the driver's seat.

Workman recalled that he entered the apartment with his gun in one hand and a baseball bat in the other. He admitted that he had to kick in the door to enter. Once inside, he encountered Crone on the couch. He told Crone to just sit down. Workman opined that if Crone had not engaged with him, the encounter would not have produced bloodshed. When he reached the top of the stairs, Workman claimed he asked for the computer. However, Crone had followed him up the stairs and lunged at him. The gun went off. Basham opened the door to his room and the dog came out. Martin had warned him that the dog, a

7

pit bull, was vicious. Workman was uncertain about whether he had hit or shot the dog, but he stopped the animal from attacking. Meanwhile, Crone continued to pursue him, so he hit Crone with the bat. Workman stated that he fired five shots in all. He claimed that the events occurred in rapid succession and that he did not know that he had shot Basham. He asserted that when he found out he was facing a murder charge, he thought it was Crone who had died from the blow to his head. Workman stated that he fled the apartment. He told Martin that "it went bad." Workman admitted that the first thing he did after leaving the apartment was to get rid of the gun.

The State rested. The circuit court asked Workman whether he had any motions, to which Workman responded, "I don't know about motions. I don't know what I need to do—they say they proved the case. The only thing they got me on was me saying I did it. Okay. I got up there and I say whatever. I didn't go up there to kill nobody for first degree murder." The circuit court called that statement a directed-verdict motion and denied it.

Workman called Jennifer Martin as his only witness in his case-in-chief. She admitted that she had solicited his help to get her computer back from Basham. She stated that she drove with him in her vehicle to the apartment where Basham was staying. Workman entered the apartment armed with a gun and a baseball bat. Soon after, he left the apartment without the computer. He hid the gun and the baseball bat at a friend's house. They then went to the Choctaw casino to play slot machines. Regarding the computer, Martin admitted that she did drive Crone to an ATM at a bank but denied that she sold the computer to him on that day.

Workman rested his case. After which, he failed to renew his directed-verdict motion. His trial counsel stepped back in and assisted with reviewing the jury instructions. Workman then began his closing argument, but after objections by the State, asked that his trial counsel take over. Workman was convicted as charged.

## II. *Argument on Appeal*

For his sole point on appeal, Workman attempts to challenge the sufficiency of the evidence. Specifically, he argues that there was insufficient evidence that he entered the apartment with the intent to commit a crime punishable by imprisonment, and thus, there was insufficient evidence that he caused Basham's death while committing or attempting to commit the felony of aggravated residential burglary. We cannot reach this argument, however, because it was not preserved for our review.

Rule 33.1 of the Arkansas Rules of Criminal Procedure requires that, to preserve a challenge to the sufficiency of the evidence in a jury trial, a criminal defendant must make a motion for directed verdict at the close of the evidence in the State's case-in-chief and at the close of all the evidence. The failure of a defendant to challenge the sufficiency of the evidence at the times and in the manner required by Rule 33.1(a) will constitute a waiver of that issue on appeal. Ark. R. Crim. P. 33.1(c) (2022). Rule 33.1 is strictly construed. *Pinell v. State*, 364 Ark. 353, 358, 219 S.W.3d 168, 172 (2005). Pro se litigants are held to the same standards as attorneys. *Eliott v. State*, 342 Ark. 237, 241, 27 S.W.3d 432, 435 (2000). As noted previously, Workman's motion at the close of the State's case, that he "[did not] go up there to kill nobody for first-degree murder," was not renewed at the close of all the evidence.

9

Accordingly, we hold that this issue is not preserved for our consideration on appeal. *Pyle v. State*, 340 Ark. 53, 60, 8 S.W.3d 491, 496 (2000). We therefore must affirm.

### III. *Rule 4-3(a) Review*

Because Workman received a sentence of life imprisonment, the record has been reviewed for all errors prejudicial to him, as required by Arkansas Supreme Court Rule 4-3(a). We first note that although Workman requested a complete transcript of the proceeding, none of the jury-selection process was transcribed. We believe that this situation is analogous to that in *McKee v. State*, 2020 Ark. 327, 608 S.W.3d 584. The *McKee* court noted that Arkansas Supreme Court Rule 3-4(b)(1) provides that jury-selection proceedings should not be included in the record "unless expressly called for by a party's designation of record." It acknowledged that "[w]hen the sentence is death or life imprisonment, the Court must review all errors prejudicial to the appellant[.]" Ark. Sup. Ct. R. 4-3(a). However, as in *McKee*, there is no indication that Workman's counsel, who represented him at trial and on appeal, intended to challenge any rulings made during jury-selection proceedings. Therefore, we assume that there were no adverse rulings. *Id*. In our review of the record before us, we have found no reversible error.

Affirmed.

*Witt Law Firm, P.C.*, by: *Ernie Witt*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Jacob H. Jones*, Ass't Att'y Gen., for appellee.

10